**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DAWN GERATY,                    )
                                )
            Plaintiff,          )
                                )        Judge Joan B. Gottschall
    v.                          )
                                )        Case No. 09 C 6992
THE VILLAGE OF ANTIOCH,         )
                                )
            Defendant.          )

## MEMORANDUM OPINION & ORDER

Plaintiff Dawn Geraty, a police officer in the Village of Antioch ("the Village"), brought

a single-count complaint under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*,

alleging that the Village discriminated against her on the basis of her sex by failing to promote

her to the position of police sergeant and by failing to transfer her to the position of detective.

The Village has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Because, construing the facts and drawing all inferences in Geraty's favor, a reasonable jury

could find that the Village discriminated against Geraty based on her sex, the motion is denied.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.[1]  For purposes of the motion

for summary judgment, the court construes the facts as favorably to Geraty as the record will

allow.  Geraty was hired as a patrol officer by the Village in 1993. She was the first female

officer hired by the Village's police department ("the department").  As of November 2006, the

---

[1]       Certain undisputed facts were not material to the court's analysis of this motion. The court
therefore omits from its recitation of the facts the Village's Statement of Facts ("SOFs") ¶¶ 1-5, 12, 16,
17, 20-22, 41, and 44- 46, as well as Geraty's Statement of Additional Facts ("SOFs") ¶¶ 51, 54, 57, 58
(second fact), 59, 60 (first fact), 71, 73 (second fact), 84 (second fact), 85, 96, 114, 122, and 123.

department had twenty-seven police officers—including five female officers—but no female officers served as sergeants, detectives, or in any other supervisory positions.

James Foerster was appointed the Village's Chief of Police in 2006. Prior to Foerster's appointment, Geraty had been targeted by a former Chief of Police, who tried to force her out of her position. No male police officers were similarly targeted. Foerster testified at deposition that prior to 2006, he had provided a very positive performance evaluation for Geraty, but that his superiors had downgraded the review to appease the then-presiding Chief.

In 2006, the department began the process of promoting officers to sergeant, a first-line supervisor position. Geraty was the only woman who submitted herself for the 2006 promotion process. At the time, she had twelve years of experience in the department—the second-most seniority among the officers who presented themselves as candidates for sergeant. It is undisputed that she was a highly experienced and well-rounded police officer and was one of the more capable officers in the department. Geraty argues that she was qualified to become either a sergeant or a detective, another position she sought. As support, she points to the deposition testimony of fellow officers Tom Nowatarski and Geoff Guttschow and department supervisors Commander Ron Roth, Commander Ron Nauman, and former Chief Charles Fagan, all of whom testified that, in their opinion, she was qualified for the positions. One officer who supervised Geraty testified that she was a "very informative" oral communicator. (P.'s Ex. 6 (Fagan Dep. 24:6).) Another called her the "Wolverine" because of the tenacious nature of her police work. (P.'s Ex. 3 (Nauman Dep. 54:12-13).)

## A. The 2006 Sergeant List

A new list of Village police officers eligible for promotion to sergeant is created about every three years, or when no eligible officers remain on the Village's existing list. The list is

created by the Village's Board of Police and Fire Commissioners ("the Board"). The Board is made up of three commissioners appointed by the Mayor. In 2006, those three were Gerald Kozenski, Kevin Schoudel, and Deirdre Palmer Sweetwood ("Palmer"). None had any law enforcement background. The commissioners generally operated pursuant to the Village's "Rules and Regulations of the Board of Police Commissioners," although the parties dispute whether those rules were actually followed during the 2006 promotion process.

In February 2006, Officer Guttschow requested that his name be removed from the existing sergeant list, which had been created in 2003. As no other officers remained on that list, the Board began the process of creating a new list. At the February 24, 2006, Board meeting, the Board provided Foerster with a sign-up sheet for sergeant candidates, to be posted publicly. Twelve officers, including Geraty, signed up. Foerster testified that he knew in February 2006 that Geraty wanted to be promoted to sergeant.

On March 7, 2006, Foerster attended a Board meeting and provided the Board with the list of officers who had signed up for the promotion process. The process by which the new sergeant list would be created was discussed at that meeting. It consisted of three parts: an anonymous written test, a subjective oral interview, and a discretionary Department Merit and Efficiency Rating assigned by the Chief of Police ("Chief Points"). To rank officers on the sergeant list, the Board was to incorporate these components into an overall score. The written test and oral interview each constituted 35% of the overall score, and the Chief Points constituted 20% of the overall score. The final 10% of the overall score included up to five points for seniority and five points for military service. Police officers were eligible for the military service points only if they had not already received credit for their military service when applying to be a

police officer.  The written exam and oral interviews were scheduled at an April 11, 2006, Board meeting, which Foerster attended.

On May 3, 2006, three days before the written sergeant promotion exam was administered, Foerster met with Geraty privately in his office. The parties agree that the two discussed Geraty's intent to apply for the sergeant's position, but they dispute what was said. Geraty testified during her deposition, based on her notes documenting the conversation, that she stated to Foerster that she was "very excited for the upcoming sergeant's exam," for which she was "studying very hard." (P.'s Ex. 2 (Geraty Dep. 63:5-7).)  Geraty testified that Foerster replied that he "did not even know [she] was interested in the sergeant position because he didn't think it would work out with [her] home [and] family life."  (*Id*. at 63:7-10.)  Geraty testified that she responded that her family life "would not be a problem" with regard to the sergeant position. (*Id*.)  Foerster, in turn, testified that, three years earlier, Geraty had told him that she was not going to sign up for the previous sergeant's exam because a sergeant's work schedule would not work for her family.  (D.'s Ex. F (Foerster Dep. 194:3-5).)  He denied that in 2006, he told Geraty that he did not think she should apply to be a sergeant.  (*Id.* at 195:21-196:24.)  Rather, he claimed that he was happy that she planned to take the exam because "three years prior to that [he] had to talk her into [taking the 2003 sergeant's exam]."[2]  (*Id.* at 196:2-4.)

The written exam was conducted on May 6, 2006.  The candidates were provided with an exam number so that they would remain anonymous.  The commissioners testified at deposition that applicants who attempted to violate the anonymous nature of the written exam should have been disqualified from the promotion process.  The written exam was graded by hand by each of the three commissioners.  A passing score was 70.  Geraty received a 76, the third-highest score of the officers taking the exam.  She was one of nine officers who passed the exam.

---

[2]    Geraty took the 2003 written exam, but she did not receive a passing score.

While the commissioners were grading the exam, one candidate, Officer David Jensen, knocked on the glass window of the room in which the test was being graded. Geraty and Officer Nowatarski testified at deposition that Jensen put a slip of paper with his test number up against the glass for the commissioners to see. Jensen denied that he showed his exam number, but he admitted that he knocked on the glass, got the attention of the Board's secretary, and tapped on his wrist to indicate that he wanted to know his score. Apart from Jensen's conduct, Geraty does not allege that the written exam was administered or graded improperly.

On May 13, 2006, the Board interviewed the nine officers who passed the written exam. Commissioner Palmer provided the other commissioners with a scoring sheet to use during the oral interviews. The sheet contained nineteen interview questions, a number range to score each response, and lines for notes on the candidates' responses to each question. The commissioners testified at deposition that they received no other information about the candidates, nor any instruction on what qualities to look for during the interviews. They denied discussing with Foerster how to identify good candidates or which candidates Foerster wanted to promote to sergeant. Foerster testified that he did not know how the Board would score the interviews or what questions would be asked, and that he never told the commissioners to promote or not promote someone based on their gender.

Geraty estimated that her interview lasted about twenty minutes. She testified at deposition that the interview appeared to be nothing more than a formality, that the commissioners did not appear to take any notes, and that she was asked questions unrelated to her qualifications to be a sergeant, including questions about her family. According to Geraty, in the middle of the interview, the Board's secretary asked Geraty about her young daughter.

All three commissioners testified that the same six to nine questions were asked of each candidate. Little evidence is available as to how the interviews were scored. Commissioner Palmer testified that during the oral interviews, the commissioners considered the candidates' thought processes, their forthcomingness, and their responses. The scoring sheets, which are undated, show few substantive notes. The sheets purportedly used by Commissioner Palmer include comments under the same set of six questions for each officer, but no scores are circled, and the comments are largely illegible.[3] The sheets purportedly used by Commissioner Kozenski show circled scores for only three applicants and contain no notations on any questions for the other applicants. Commissioner Kozenski gave Officers Daryl Youngs and Geraty the same ratings on the three questions for which he recorded scores, but he gave Officer Youngs a higher overall interview score. The sheets used by Commissioner Schoudel show scored answers for only three candidates.

Commissioners Schoudel and Palmer testified at deposition that they remembered nothing specific from the oral interviews. Commissioner Kozenski was the only commissioner who claimed to recall Geraty's interview. He testified as follows:

> Basically she did all right on her exam [but] . . . I don't know that she . . . came across at that particular time that she was really ready to take on the responsibilities of . . . of other people, okay, other than herself. The answers to the questions that I can remember were pretty short, not a lot of information given back. She answered the questions, there was no doubt about that, versus what some of the other people did which they kind of expounded on it a little bit more and gave a little more description of what they felt. . . . [T]he way we scored it just came out that it was, at least on my part, somewhat below two of them but a lot higher than several of the other ones, kind of somewhere in the middle . . . .

---

[3] The Village objects that the word "purportedly" constitutes improper argument. But the forms themselves do not conclusively establish which commissioner used them; some are completely blank except for the officer's name at the top. Therefore, the word "purportedly" is appropriate. In addition, although Geraty states that the sheets "show" how many questions were posed to each officer, the notes on the scoring sheets merely support an inference that certain questions were asked.

> Other than that . . . I just didn't feel like the confidence was there that some of the other people, particularly Aron [Fendel] and [David] Jensen and those guys, had shown . . . .

(P.'s Ex. 15 (Kozenski Dep. 87-88).) Kozenski testified that he believed Officer Jensen "gave a good interview. He seemed to come across with a little bit more confidence, a little more exuberance . . . like he really wanted to be a go-getter type guy." (*Id*. at 89.)

Commissioner Palmer testified that the commissioners discussed their subjective evaluations of the officers and came up with scores after each interview, while Commissioners Kozenski and Schoudel testified that the commissioners averaged each candidate's score. It is unclear whether the interview scores were finalized before or after Foerster provided the Board with the candidates' Chief Points on May 15, 2006. The May 18, 2006 Board meeting minutes state, "All testing for the Sergeant's promotional list has been completed. Oral interviews were conducted on May 13, 2006 with scoring finalized on May 18, 2006." (P.'s Ex. 34 (Board Minutes, May 18, 2006).) The Board's report of the oral scores is undated. The Chief Points assigned by Foerster correlated with the candidates' seniority, with one exception: although Geraty had more seniority than Jensen, Foerster gave Jensen more Chief Points than Geraty.

The Board produced a list ranking the sergeant candidates as follows:

| Officer (Years of Experience) | Overall Rank | Written Score (35%) | Oral Score (35%) | Chief Points (20%) | Seniority ( + Military Service) (10%) |
|---|---|---|---|---|---|
| Daryl Youngs  (13) | 1 | 86 | 80 | 100 | 5 |
| David Jensen  (11) | 2 | 71 | 98 | 90 | 5 |
| Geoffrey Guttschow  (6) | 3 | 80 | 90 | 60 | 5 |
| Rich Moritz  (5) | 4 | 71 | 90 | 40 | 5 ( + 5) |
| John Laskowski  (8) | 5 | 74 | 80 | 70 | 5 |
| Dawn Geraty  (12) | 6 | 76 | 70 | 80 | 5 |
| Aron Fendel  (6) | 7 | 72 | 85 | 50 | 5 |
| Norm Johnson  (4) | 8 | 71 | 70 | 30 | 4 |
| Tom Nowotarski  (3) | 9 | 72 | 75 | 10 | 3 |

After tabulation of the scores, Geraty ranked sixth of the nine sergeant candidates.[4] The commissioners gave Officer Jensen the highest interview score—a near-perfect 98 of 100 points, which placed him second on the final 2006 sergeant list. Geraty received the lowest score on the interview. Geraty testified that she believed Foerster told the commissioners to "tank" her interview score but admitted that she lacked personal knowledge of any such communication.

Geraty points to evidence that the 2006 sergeant list was not an accurate reflection of the relative qualifications of the sergeant candidates. Other officers testified at deposition that they were "surprised" that Officer Jensen ranked second on the list, because he was a "barely adequate" patrol officer who had "no respect" for the department and was unqualified to be sergeant. (P.'s Ex. 9 (Youngs Dep. 43:10-13); Ex. 1 (Roth Dep. 31:23-24); Ex. 3 (Nauman Dep. at 35:8).) Commander Nauman testified that in 2006, Jensen was "not a hard worker" and was unqualified to be sergeant. (P.'s Ex. 3 (Nauman Dep. 35:8, 36:10-15).) Commander Roth testified that "the bulk of the officers with the Antioch Police Department felt that Dave Jensen should not be a sergeant." (P.'s Ex. 1 (Roth Dep. 67:11-14).)

Officer Guttschow received the second highest oral interview score. Guttschow testified that Foerster had asked him to remove his name from the 2003 sergeant list because he was not ready to be promoted to sergeant. Commander Nauman similarly testified that in 2006, Guttschow was unqualified to be a sergeant.

Geraty also casts doubt on the qualifications of the other officers who ranked above her on the sergeant list. She points to evidence that Officer Nowatarski informed the Board during his oral interview that he did not want the sergeant position and that it would be a disservice to the department to promote him due to his lack of experience. Even so, he received a higher

---

[4]    Before the application of military points, Geraty ranked fifth on the list. Officer Moritz received five military points, which moved him into fourth on the list, above Geraty. The parties dispute whether Moritz was eligible to receive military points in 2006, and the record is ambiguous on the matter.

interview score than Geraty. Officer Youngs, who ranked first on the list, was promoted immediately, but he resigned from the position in 2008. Nauman testified that he could not recall another officer ever turning in his sergeant stripes.

## B. Promotion from the Sergeant List

The Rules and Regulations permitted the Chief of Police to select for promotion to sergeant any of the officers in the top three positions on the sergeant list. After the 2006 promotion process, Foerster promoted Youngs and Jensen to sergeant. When the next sergeant position became available, Foerster promoted Guttschow. After Youngs resigned from the sergeant position, Foerster promoted Moritz. Laskowski and Fendel were also promoted to sergeant. During his tenure as Chief, Foerster promoted to sergeant the first through fifth officers on the 2006 sergeant list, as well as the seventh officer—skipping over Geraty.

## C. Other Promotions and Transfers

As Chief of Police, Foerster had the discretion to reassign patrol officers to other more desirable positions, including detective. Foerster gave new assignments—such as code enforcement officer, lead field training officer, and detective—to male officers who had participated in the sergeant promotion process.[5] He reassigned male officers ranked similarly to Geraty to positions she characterizes as more desirable.

After the sergeant list was published, Foerster offered Geraty the position of School Resource Officer ("SRO"). According to Commander Nauman, the SRO "baby-sit[s]" the Antioch high school kids. (P.'s Ex. 3 (Nauman Dep. 99:22-24, 100:1).) When Officer Nowatarski worked as an SRO, he investigated physical confrontations between students, criminal damage to property, and theft of personal belongings, and he acted as a counselor to the

---

[5] Geraty calls these new assignments promotions to "advanced" positions, but none of the deposition testimony cited discusses the relative levels of the positions.

students.  On May 22, 2006, Foerster held a closed-door meeting with Geraty.  He offered her the SRO position, telling her she could wear a "gold badge." (P.'s Ex. 10 (Foerster Dep. 294-95).)  Geraty declined the offer.  The parties dispute what else Foerster said during the meeting.  Geraty testified that Foerster stated that the SRO position would be better for Geraty's "family life" because it had a Monday-Friday schedule.  (P.'s Ex. 2 (Geraty Dep. 117:16-17).)  Foerster testified that he did not remember making that statement.  (P.'s Ex. 10 (Foerster Dep. 229:5-11).)  Foerster testified that he thought Geraty would be happy with the SRO position and would like wearing a gold badge (which is also worn by detectives and sergeants), because "[a]ll police officers want gold badges."  (*Id.* at 294:22-295:5).)

Geraty wished to be assigned to the position of detective.  Although detectives make the same base pay and receive the same benefits as patrol officers, Geraty described the position as prestigious and "high profile."  (P.'s Ex. 2 (Geraty Dep. 291:8, 291:18).)  While patrol officers drive around in squad cars answering calls, enforcing traffic laws, and responding to citizen complaints, the detective position involves investigating cases, obtaining warrants, working up leads, and collecting evidence to sustain prosecutions. The detective position, unlike the patrol officer position, involves a flexible schedule and the opportunity to work "a lot" of overtime. (*Id*. at 269:8-9.)

There is no requirement that a police officer first serve as the SRO before becoming detective, but Foerster testified that he believed it was good practice. Of the male officers in the department who worked as detective, those who worked first as the SRO included Officers Rick Moritz, Norm Johnson, Alex Moreno, Tom Nowatarski, Ron Nauman, Daryl Youngs, and David Jensen. Officer Aron Fendel, however, was made a detective without first serving as the SRO.

Geraty was not assigned to the detective position. Commander James Ruth testified at deposition that Foerster told him in 2010 that Foerster "wasn't the one that denied her the detective position, that he had actually brought it up to" other supervisors, including Commander Roth, and they did not want Geraty to be a detective. (P.'s Ex. 7 (Ruth Dep. 28:1-11).) Commander Roth, however, testified he never denied Geraty the detective position, and that Foerster had the authority to determine who was made detective.

In 2010, after Foerster was no longer the Chief of Police, Geraty was promoted to head the Village's Domestic Violence Unit, where she has primary responsibility for supervising and investigating domestic violence calls.

## D. Other Incidents involving Female Officers

In an effort to demonstrate that sexism existed in the department, Geraty points to other incidents involving herself and other female officers. On June 28, 2007, Jensen gave Geraty a disciplinary memorandum about leaving her squad car in the sally port. He gave a copy to Geraty's superior officers. Male officers had left their squad car in the sally port without being written up.[6] Also in 2007, Jensen ordered Geraty to exit her squad car. When she tried to explain why she needed the car, Jensen stated in a loud voice that he needed to "get another squad because 'Queen Bee' can't move out of her squad." (P.'s Ex. 2 (Geraty Dep. 183:14-16).) The parties dispute what happened next. Geraty testified that Foerster wrote her up for being disrespectful to Jensen, without speaking to Jensen or giving her an opportunity to explain. Foerster testified that he talked to both Geraty and Jensen and wrote them both up but did not recall what he did with the write-up of Jensen. (D.'s Ex. F (Foerster Dep. 268:20-269:22).)

---

[6] The Village disputes this, but Jensen admits in his deposition testimony that he did not write anyone else up for parking in the sally port. (P.'s Ex. 23 (Jensen Dep. 223:3-15).)

Geraty was off duty for a period of time due to a work-related injury. Foerster testified at deposition that he was aware "Geraty was going to return to work and [might] not be able to qualify with her side arm." (P.'s Ex. 10 (Foerster Dep. 265:15-17).) The General Order then in effect regarding the department's firearms policy required remedial range training for officers who did not pass the required annual firearms qualification. (P.'s Ex. 59 (2004 General Order 87).) Foerster admitted that he changed the department's General Order relating to firearms qualification because Geraty was returning to work. (P.'s Ex. 10 (Foerster Dep. 266:20-24).) The General Order as rewritten in 2010 provided the Chief of Police with the ability to deem unfit for duty and terminate an officer who failed firearms qualification after three attempts. (P.'s Ex. 58 (2010 General Order 87).)

Geraty also points to the fact that Foerster attempted to terminate two other female officers in the department. One, Anna Dressler, planned to marry Commander James Ruth's son. Foerster informed Ruth and Dressler that Dressler could remain on the force only if Ruth agreed to retire. Otherwise, Foerster would terminate Dressler when she returned to work after her wedding. Foerster also attempted to terminate Officer Rachel Wargula. He claimed that she was an incompetent officer who should not pass her probationary period. Other officers who worked with Wargula reported no safety issues, although Jensen described her as "subpar" and lackadaisical."[7] (P.'s Ex. 23 (Jensen Dep. 155:12-15).) She successfully completed probation. Foerster unsuccessfully tried to terminate Wargula while she was off work due to an injury.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56;

---

[7] The Village cites to additional deposition testimony in an effort to dispute whether that no officers reported safety issues with Officer Wargula, but the pages are not included in the cited exhibit.

*Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "Statements of 'beliefs' or 'opinions' are insufficient to create a genuine issue of material fact." *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994). The court construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Speculation or a mere scintilla of evidence will not suffice to defeat summary judgment. *Roger Whitmore Auto. Servs. v. Lake Cnty.*, 424 F.3d 659, 669 (7th Cir. 2005).

### III. ANALYSIS

Under Title VII, employers may not "fail or refuse to hire or to discharge any individual, or otherwise [] discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e2(a)(1). Denying a woman a promotion because of a stereotypical belief about her obligation to her family is discrimination based on sex and is prohibited by Title VII. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971).

Geraty claims that both the Village's failure to promote her to sergeant and its failure to make her detective violated Title VII. The Village responds that Geraty's claims fail because her low interview score cost her the sergeant position, and that score was not the product of discrimination. The Village further argues that the failure to assign Geraty to the detective position was not a materially adverse employment action and thus could not violate Title VII.

To withstand the Village's motion for summary judgment, Geraty must put forth evidence that she suffered an adverse employment action, as well as evidence that the action was

the product of discrimination based on her sex. There are two ways to establish discrimination. Under the "direct method," Geraty must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue." *Egonmwan v. Cook Cnty. Sheriffs Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). Alternatively, under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), she must establish a *prima facie* case of discrimination and show that the defendants' proffered "legitimate, non-discriminatory reasons for their actions . . . were pretextual." *Egonmwan*, 602 F.3d 845, 850 (7th Cir. 2010). Geraty attempts to establish her claim using both methods, and the court finds that she has produced enough evidence to reach a jury under either method.

**A. The 2006 Sergeant List**

Geraty was not promoted to sergeant immediately after the 2006 promotion process. The evidence shows that Foerster could promote any of the top three officers on the sergeant list, and that Geraty was ranked sixth. Thus, Foerster could not have immediately promoted Geraty to sergeant, even had he wanted to. Geraty's challenge to the department's failure to immediately promote her to sergeant in 2006 is therefore directed at the process by which the list was created.

Geraty received the third-highest score on both the written exam and the Chief Points. Had those two scores alone determined the sergeant list, she would have been ranked third and eligible for an immediate promotion. Geraty does not allege that the written exam was improper, although she argues that Officer Jensen behaved improperly while the exam was being graded and should have been disqualified immediately. She argues, however, that her low score on the interview was inexplicable, and that a jury could infer that it was the result of discrimination.

1. <u>Direct Method</u>

In order to survive summary judgment under the direct method, Geraty must present direct or circumstantial evidence showing "that the decision-maker acted because of the prohibited animus." *Venturelli v. ARC Cmty. Servs.*, 350 F.3d 592, 601 (7th Cir. 2003). Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," *id.* at 599, and is "rarely found," *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). A plaintiff more commonly satisfies the direct method by piecing together a "convincing mosaic" of circumstantial evidence pointing to a discriminatory reason for the employer's action. *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). Circumstantial evidence may include: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class, and the employer's reason is a pretext for discrimination. *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (quoting *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)).

With respect to Geraty's interview score, the commissioners are the relevant decision-makers. The Village argues that there is no evidence that the commissioners intentionally discriminated against Geraty, or that any discrimination by Foerster influenced the interview scores. The court concludes, however, that Geraty has provided sufficient circumstantial evidence that her interview score resulted from discrimination.

First, the court finds that a jury could infer from the commissioners' explanations of Geraty's interview score that the Board relied on quintessentially gendered characteristics in

ranking the sergeant candidates.  As the Seventh Circuit has held, a plaintiff may prevail if she can show that an interviewer "relied on sex stereotypes in making the employment decision." *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 362 (7th Cir. 1995).  Geraty testified that Foerster expressed concerns about her family obligations in a private meeting a few days before her interview.  She also testified that the Board did not appear to take her interview seriously.  In the middle of Geraty's interview, the Board's secretary asked Geraty about her daughter.  A jury could infer that the question of family responsibilities was raised in Geraty's interview, but not during the interviews of the male sergeant candidates.  In this context, the statement by Commissioner Kozenski that Geraty did not "c[o]me across at that particular time [as] ready to take on the responsibilities of . . . of other people, okay, other than herself" supports the inference that the Board was concerned about Geraty's family obligations.[8]

The commissioners also made statements about Geraty's interview performance that suggest that sex stereotypes played a role in their evaluation of the sergeant candidates.  Commissioner Kozenski stated that Geraty showed a lacked of confidence, while Jensen was more confident and "a go-getter type guy."  A jury could infer that the commissioners' evaluations of Jensen and Geraty show they were looking for gendered characteristics, deemed Geraty to be less assertive than the male sergeant candidates, and ranked the officers accordingly.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").

---

[8]     The Seventh Circuit has held that questions about family obligations, even when directed only at a female interviewee, are in themselves insufficient to support a jury verdict of sex discrimination.  *Bruno*, 950 F.2d at 365.  In this case, however, Geraty presents additional evidence "that the employer based his decision on the sex stereotypes implicit in such questions when directed only to women."  *Id.*  And unlike in *Bruno*, a jury could reasonably infer from Kozenski's testimony that he was concerned about Geraty's family obligations and scored her interview accordingly, but had no similar concerns about male officers.

The Village has presented little in the way of notes or deposition testimony about the interviews to dispel these inferences. The interview score sheets provide almost no information about the scoring process. Commissioner Kozenski testified that the commissioners ranked Geraty in the middle of the pack, which is not consistent with her actual score. The other Board members claim no memory of the interviews at all.

The court also concludes that the jury could infer that the commissioners' rankings of the sergeant candidates did not corresponded to their actual qualifications. This provides additional circumstantial evidence that the commissioners' explanation of Geraty's score was a pretext for discrimination. The commissioners gave a nearly perfect score to Jensen, whom at least two commanders and a fellow officer found to be highly unqualified. This was despite Jensen's improper conduct during the written portion of the exam—conduct demonstrating that he lacked judgment and was inappropriately aggressive. A jury could reasonably conclude that the Board members observed Jensen's conduct during the written exam and that, given his behavior during the promotion process, his high interview score was unfounded. Meanwhile, the Board gave a low score to Geraty despite the fact that at least three officers and three commanders considered her qualified to be a sergeant. The ample evidence that Geraty was better qualified than Jensen and some of the other male officers who scored higher than she did on the interview, along with the evidence that she was an effective communicator outside of the oral interview, casts doubt on the commissioners' proffered reasons for her score.

Viewing the evidence in the light most favorable to Geraty, a jury could also infer that the Board was influenced by Foerster's bias against Geraty. Although Foerster and the commissioners testified that the Chief did not tell the Board how to score the candidates, Foerster did meet with the commissioners several times before and during the promotion process. The

Board may also have received Foerster's Chief Points before the interview scores were finalized, and could have been influenced by the fact that Foerster gave Jensen more Chief Points than Geraty, departing from the order of seniority only to lower Geraty's score.

In summary, Geraty has produced direct evidence from which a jury could infer that the commissioners acted based on their own biases or were influenced by Foerster's. Taken together, this evidence would support a jury verdict that the Board's evaluation of Geraty was not just ill-informed or arbitrary, but based on sex stereotypes that disadvantaged Geraty. Because Geraty has presented "some evidence t[ying] the adverse job action to the protected category," she is entitled to present her claim to a jury. *Diettrich v. NW Airlines*, 168 F.3d 961, 966 (7th Cir. 1999).

2. Indirect Method

Geraty also has made a sufficient showing of discrimination under the indirect method. That method requires Geraty to first make out a *prima facie* case of discrimination by showing that (1) she was a member of a protected class; (2) she applied and was qualified for the position she sought; (3) she was rejected for the position; and (4) the position was given to a person outside the protected class who was similarly or less qualified. *See Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). If Geraty establishes a *prima facie* case, the burden shifts to the Village to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). If the Village can do so, the ultimate burden shifts back to Geraty to show that the Village's purported reason for not promoting her was pretextual. *Id.*; *see also Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")

The first and third elements of the *prima facie* case are not at issue in this case; Geraty is female, and she was not promoted to sergeant. The Village argues that she was not qualified for the position because she received a low score on the interview portion of the promotion process, and that the male candidates promoted to sergeant were better qualified to be sergeant because of their higher scores. But the court must undertake its own analysis of the qualifications of the plaintiff and the other candidates to whom she is compared. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 402-03 (7th Cir. 2008) (comparing the characteristics of the plaintiff with those of the person promoted). Geraty has presented ample evidence of her experience, work ethic, and skill as an officer, as well as positive evaluations by other officers and superiors. The court concludes that Geraty has established that she was qualified for the promotion and similarly or more qualified than her male peers. She has therefore established a *prima facie* case of discrimination.

"Once the plaintiff establishes this *prima facie* case, there is a presumption of discrimination that obligates the employer to produce a legitimate nondiscriminatory reason for its decision." *Debs v. Ne. Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). The Village contends that it had a legitimate, non-discriminatory reason for not promoting Geraty: her low interview score. "Once the explanation is given, the presumption falls away and the judge has to decide whether there is enough evidence of unlawful conduct to entitle the plaintiff to a trial." *Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007). To proceed to trial, Geraty must offer some evidence "that this proffered explanation is pretextual." *Fischer*, 519 F.3d at 403. To do so, she "must show that (1) the employer's nondiscriminatory reason was dishonest; and (2) the employer's true reason was based on a discriminatory intent." *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007) (internal citation, quotation, and alteration omitted).

As discussed above, Geraty has provided evidence sufficient for a jury to find that the commissioners' proffered reason for her low score "was not the true reason, or, to the extent that it was, that [the commissioners' low evaluation of her] was based on sex stereotypes." *Lust v. Sealy, Inc.*, 277 F. Supp. 2d. 973, 981 (W.D. Wis. 2003). Moreover, Geraty has marshaled significant evidence that she was better qualified to be sergeant than candidates who were ranked above her. A plaintiff's superior qualifications can be evidence of pretext if she can "show that her qualifications are 'clearly superior,' or that she is 'significantly better qualified' for the job, or that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Mlynczak v. Bodman*, 442 F.3d 1050, 1060 (7th Cir. 2006); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext."). A jury could reasonably conclude that Geraty was a superior candidate for the sergeant position, that the explanations given for her low interview score were pretextual, and that the commissioners relied on impermissible sex stereotypes in scoring Geraty's interview.

## B. Foerster's Failure to Promote Geraty

After the 2006 promotion exam, the Village promoted six officers to sergeant. Those officers ranked first through fifth and seventh on the 2006 sergeant list. The only officer not promoted was Geraty. Even if a jury did not believe that Geraty's low interview score was itself the product of discrimination, it could reasonably find that Geraty was not subsequently promoted to sergeant because of sex discrimination.

Geraty has offered significant evidence of Foerster's discriminatory animus toward her, including his repeated comments about her family obligations, the fact that, in awarding Chief Points, he departed from the order of seniority only to lower Geraty's points, and the fact that he

revised the firearms policy because Geraty was due to return to active duty. Geraty has also presented evidence suggesting a history of sexist behavior in the department, which had no female officers in supervisory roles as of 2006. That evidence includes a "witch hunt" against Geraty by the former Chief of Police, Foerster's efforts to terminate other female officers, and Jensen's disrespectful and sexist treatment of Geraty.

The Village argues that because the promotions to sergeant were determined by the 2006 sergeant list, any animus on Foerster's part or sexism in the department is irrelevant. But that argument applies only to the first two promotions from the sergeant list. Foerster had the authority to select any of the top three names on the sergeant list to fill a sergeant vacancy. He promoted Officers Moritz (ranked fourth), Laskowski (ranked fifth), and Fendel (ranked seventh) instead of Geraty. The court concludes that, with respect to these later promotions, Geraty has presented enough evidence to reach a jury on her claim that she was not promoted to sergeant for discriminatory reasons.

## C. The Detective Position

The Village argues that Foerster's failure to transfer Geraty to a detective position was not a materially adverse employment action and is therefore not actionable under Title VII. Title VII does not protect employees from all changes in the terms, conditions, or privileges of employment. Recovery is limited to instances in which an employer has taken a "materially adverse employment action," meaning that "day-to-day travails and disappointments" will not support a Title VII claim. *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). Failure to promote an individual generally constitutes a materially adverse employment action as a matter of law. *Collum v. Brown*, 209 F.3d 1035, 1042 (7th Cir. 2000). Whether denial of a transfer to a

new assignment is materially adverse, however, is a factual question which must be put to a jury. *Lewis v. City of Chi. Police Dept.*, 590 F.3d 427, 436-37 (7th Cir. 2009).

In this case, Geraty has offered enough evidence that not being assigned the detective position constituted an adverse action to present the question to a jury. Even "a nominally lateral transfer with no change in financial terms" may be a materially adverse employment action if it "significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted[.]" *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)). "Whether a change in job responsibilities is materially adverse all depends on how much of a change, and how disadvantageous a change, took place." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009) (internal citation and quotation marks omitted).

Based on the evidence that the detective position is higher profile, more challenging and prestigious, and more flexible than the patrol officer position, a reasonable jury could conclude that the failure to make Geraty a detective constituted a materially adverse employment action. Other courts have held as much. For instance, a court in this district sent to a jury the question of whether a transfer from detective to patrol officer was an adverse employment action constituting retaliation. *Hare v. Zitek*, 414 F. Supp. 2d 834, 858 (N.D. Ill. 2005). Appellate courts have upheld jury verdicts for plaintiffs based on similar facts, even when the positions in question involved equal pay. *See, e.g.*, *Virostek v. Liberty Twp. Police Dept./Trs.*, 14 F. App'x 493, 511 (6th Cir. 2001); *Lewallen v. City of Beaumont*, 394 F. App'x 38, 43 (5th Cir. 2010). At the very least, the availability of "a lot" of overtime as a detective creates an issue of fact as to

whether the withholding of the detective position constituted a materially adverse employment action. *See Lewis*, 590 F.3d at 436-37.

## IV. CONCLUSION

For the reasons stated above, the Village's motion for summary judgment is denied.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: April 18, 2013